1  **ROBERT H. REXRODE, III**
   California State Bar No. 230024
2  427 C Street, Suite 300
   San Diego, California 92101
3  Telephone: (619) 233-3169, Ext. 13
   Facsimile: (619) 684-3553
4  robert_rexrode@rexrodelawoffices.com

5
   Attorneys for Mr. Eduardo Hernandez-Bahena
6

7
                    UNITED STATES DISTRICT COURT
8
                  SOUTHERN DISTRICT OF CALIFORNIA
9
                   (**HONORABLE DANA M. SABRAW**)
10

11  UNITED STATES OF AMERICA,        ) CASE NO.  07cr2871-DMS
                                     )
12          Plaintiff,               )
                                     )
    v.                               ) STATEMENT OF FACTS AND
13                                   ) MEMORANDUM OF POINTS AND
    EDUARDO HERNANDEZ-BAHENA,        ) AUTHORITIES IN SUPPORT OF
14                                   ) DEFENDANT'S MOTIONS.
            Defendant.               )
15  _____ )
                                     )

16                                   **I.**

17                          **FACTUAL HISTORY**[1]

18          On August 22, 2007, agents arrested Mr. Hernandez-Bahena on suspicion of being in

19  the country illegally.  On October 17, 2007, the government secured an indictment against

20  Mr. Hernandez-Bahena, charging a violation of 8 U.S.C. § 1326.

21                                   **II.**

22      **MOTION TO DISMISS INDICTMENT DUE TO MISINSTRUCTION**

23  **A.  Introduction**

24          The indictment in this case was returned by the January 2007 grand jury.  That grand

25  jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on

26

27  _____

28  [1]The following facts are based on information provided by the government.  Mr. Hernandez-
    Bahena does not admit their accuracy and reserves the right to challenge them.

January 11, 2007.  *See Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007.[2]  Judge Burns' instructions deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[3]

    After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, *see* Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." *See id.* at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" *See id.* at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

---

[2]The following motion has been litigated extensively in this district.  District Judge Barry Ted Moskowitz entered a written decision on this motion in *United States v. Martinez-Covvarrubias*, No. 07cr0491-BTM.  Given the size of the transcripts under consideration, and as both the government and the Court likely have these transcripts, Mr. Hernandez-Bahena has **not** attached either of the two transcripts he cites to in this motion.  The first transcript referred to is the *Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007.  Mr. Hernandez-Bahena refers to this transcript as "Exhibit A" throughout this motion.  The second transcript cited to by Mr. Hernandez-Bahena is the *Partially redacted, transcripts of the grand jury impanelment proceedings*.  Mr. Hernandez-Bahena refers to this transcript as "Exhibit B" throughout this motion.  If the Court prefers, Mr. Hernandez-Bahena is happy to provide a copy of these transcripts.

[3]  *See, e.g.*, *United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-Vargas II*); *United States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*); *United States v. Marcucci*, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[4]  *See also id.* at 20 ("You're all about probable cause.").

1    Immediately before limiting the grand jurors' powers in the way just described, Judge

2    Burns referred to an instance in the grand juror selection process in which he excused three

3    potential jurors.  *See id.* at 8.

4         I've gone over this with a couple of people.  You understood from the
          questions and answers that a couple of people were excused, I think three in

5         this case, because they could not adhere to the principle that I'm about to tell
          you.

6

7    *Id.*  That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect

8    to their disagreement with Congress.  *See id.* at 8-9.  Thus, Judge Burns not only instructed

9    the grand jurors on his view of their discretion; he enforced that view on pain of being

10   excused from service as a grand juror.

11        For example, in one of his earliest substantive remarks, Judge Burns makes clear that

12   the grand jury's sole function is probable cause determination.

13        [T]he grand jury is determining really two factors: "do we have a reasonable
          belief that a crime was committed?  And second, do we have a reasonable

14        belief that the person that they propose that we indict committed the crime?"
          If the answer is "yes" to both of those, then the case should move forward.  If

15        the answer to either of the questions is "no," then the grand jury should not
          hesitate and not indict.

16

17   *See* Exhibit B at 8.[5]  In this passage, Judge Burns twice uses the term "should" in a context

18   that makes clear that the term is employed to convey instruction: "should" cannot reasonably

19   be read to mean optional when it addresses the obligation not to indict when the grand jury

20   has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that

21   the person that they propose that we indict committed the crime."

22        Equally revealing are Judge Burns' interactions with two potential grand jurors who

23   indicated that, in some unknown set of circumstances, they might decline to indict even

24   where there was probable cause.  Because of the redactions of the grand jurors' names,

25   Mr. Hernandez-Bahena will refer to them by occupation.  One is a retired clinical social

26   _____

27        [5]*Please see* footnote 2, *supra*.

28                                            3                                    07cr2871

1    worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The CSW

2    indicated a view that no drugs should be considered illegal and that some drug prosecutions

3    were not an effective use of resources.  *See id.* at 16.  The CSW was also troubled by certain

4    unspecified immigration cases.  *See id.*

5         Judge Burns made no effort to determine what sorts of drug and immigration cases

6    troubled the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts

7    of cases actually filed in this district, such as drug smuggling cases and cases involving

8    reentry after deportation and alien smuggling.  Rather, he provided instructions suggesting

9    that, in any event, any scruples LCW may have possessed were simply not capable of

10   expression in the context of grand jury service.

11        Now, the question is can you fairly evaluate [drug cases and immigration
          cases]?  Just as the defendant is ultimately entitled to a fair trial and the person
12        that's accused is entitled to a fair appraisal of the evidence of the case that's in
          front of you, so, too, is the United States entitled to a fair judgment.  If there's
13        probable cause, then the case should go forward.  *I wouldn't want you to say*,
          "well, yeah, there's probable cause, but I still don't like what our government
14        is doing.  I disagree with these laws, so I'm not going to vote for it to go
          forward."  If that is your frame of mind, the probably you shouldn't serve.
15        Only you can tell me that.

16   *See id.* at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge

17   Burns let the grand juror know that he would not want him or her to decline to indict in an

18   individual case where the grand juror "[didn't] like what our government is doing," *see id.*

19   at 17, but in which there was probable cause.  *See id.*  Such a case "should go forward."  *See*

20   *id.*  Given that blanket proscription on grand juror discretion, made manifest by Judge Burns'

21   use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even

22   if [the CSW] thought the evidence warranted it."  *See id.*  Again, Judge Burns' question

23   provided no context; he inquired regarding "a case," a term presumably just as applicable to

24   possession of a small amount of medical marijuana as kilogram quantities of

25   methamphetamine for distribution.  Any grand juror listening to this exchange could only

26   conclude that there was *no* case in which Judge Burns would permit them to vote "no bill"

27   in the face of a showing probable cause.

28

07cr2871

1  Just in case there may have been a grand juror that did not understand his or her

2  inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home

3  in his exchange with REA.  REA first advised Judge Burns of a concern regarding the

4  "disparity between state and federal law" regarding "medical marijuana."  *See id.* at 24.

5  Judge Burns first sought to address REA's concerns about medical marijuana by stating that

6  grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into

7  account.

8  Well, those things -- the consequences of your determination shouldn't concern
   you in the sense that penalties or punishment, things like that -- we tell trial
9  jurors, of course, that they cannot consider the punishment or the consequence
   that Congress has set for these things.  We'd ask you to also abide by that.  We
10  want you to make a business-like decision of whether there was a probable
   cause. ...

11

12  *Id.* at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors,

13  Judge Burns went on to suggest that REA recuse him or herself from medical marijuana

14  cases.  *See id.* at 25.

15  In response to further questioning, REA disclosed REA's belief "that drugs should be

16  legal."  *See id.*  That disclosure prompted Judge Burns to begin a discussion that ultimately

17  led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

18  I can tell you sometimes I don't agree with some of the legal decisions
   that are indicated that I have to make.  But my alternative is to vote for
19  someone different, vote for someone that supports the policies I support and
   get the law changed.  It's not for me to say, "well, I don't like it.  So I'm not
20  going to follow it here."
   You'd have a similar obligation as a grand juror even though you
21  might have to grit your teeth on some cases.  Philosophically, if you were a
   member of congress, you'd vote against, for example, criminalizing marijuana.
22  I don't know if that's it, but you'd vote against criminalizing some drugs.
   That's not what your prerogative is here.  You're prerogative instead
23  is to act like a judge and say, "all right.  This is what I've to  deal with
   objectively.  Does it seem to me that a crime was committed?  Yes.  Does it
24  seem to me that this person's involved?  It does."  *And then your obligation, if
   you find those to be true, would be to vote in favor of the case going forward.*
25

26  *Id.* at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part

27  test, which, if both questions are answered in the affirmative, lead to an "obligation" to

28  indict.

07cr2871

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers.  I'll excuse you at this time.

*Id.* at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," *see id.*, as it should.  Because REA's vote "depend[s] on the case," *see id.*, it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause.[6]  Again, Judge Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."  *See id.* at 27.  That is why even the "chance," *see id.*, that a grand juror might not vote to indict was too great a risk to run.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  *See id.* at 20.[7]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to*

---

[6] That fact belies the government's claim that Judge Burns excused only prospective jurors who "expressed inability to apply the laws passed by Congress."  *See* Exhibit B at 8.

[7] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.

07cr2871

> *present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

*Id.* (emphasis added).[8]  The district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

In the general instructions, Judge Burns posits a duty on the part of the prosecutor to present to the grand jurors evidence that tended to undercut probable cause. *See* Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

*Id.*  The antecedent to this instruction is also found in the impanelment.  After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," *see* Exhibit B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that." *See id.*  Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." *See id.*[9]

//

---

[8]  The "in most instances" language suggests that there may be some limit on this principle. Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

[9]  The impanelment instructions go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Exhibit B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me." *See id.* at 43.  *See also id.* at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

07cr2871

**B. Argument**

    **i.**        **Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

        The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. *See Navarro-Vargas II*, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[10] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in *Navarro-Vargas II*.

        For instance, with respect to the grand jury's relationship with the prosecution, the *Navarro-Vargas II* majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" *Navarro-Vargas II*, 408 F.3d at 1200 (quoting *Butz v. Economou*, 438 U.S. 478, 510 (1978)). *Accord Navarro-Vargas I*, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). *See also Navarro-Vargas II*, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, *id.*, but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." *Id.* *See* Niki Kuckes, *The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included

---

    [10] *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

                               07cr2871

1  in the Bill of Rights'") (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed.

2  1999)).

3      Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the

4  attributes set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986). *See id.*

5

6      The grand jury thus determines not only whether probable cause exists, but
       also whether to "charge a greater offense or a lesser offense; numerous counts
       or a single count; and perhaps most significant of all, a capital offense or a

7      non-capital offense -- all on the basis of the same facts. And, significantly, the
       grand jury may refuse to return an indictment even "'where a conviction can

8      be obtained.'"

9  *Id.* (quoting *Vasquez*, 474 U.S. at 263). The Supreme Court has itself reaffirmed *Vasquez*'s

10 description of the grand jury's attributes in *Campbell v. Louisiana*, 523 U.S. 392 (1998),

11 noting that the grand jury "controls not only the initial decision to indict, but also significant

12 questions such as how many counts to charge and whether to charge a greater or lesser

13 offense, including the important decision whether to charge a capital crime." *Id.* at 399

14 (citing *Vasquez*, 474 U.S. at 263). Judge Hawkins notes that the *Navarro-Vargas II*

15 majority accepts the major premise of *Vasquez*: "the majority agrees that a grand jury has the

16 power to refuse to indict someone even when the prosecutor has established probable cause

17 that this individual has committed a crime." *See id.* at 1214 (Hawkins, J. dissenting). *Accord*

18 *Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J., dissenting); *Marcucci*, 299 F.3d at 1166-73

19 (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong

20 support in the Ninth Circuit. But not in Judge Burns' instructions.

21     **ii.    The Instructions Forbid the Exercise of Grand Jury Discretion
              Established in Both *Vasquez* and *Navarro-Vargas II*.**

22

23     The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room

24 for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the

25 analysis in its previous decision in *Marcucci*. *Marcucci* reasoned that the instructions do not

26 mandate that grand jurors indict upon every finding of probable cause because the term

27 "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted).

28 That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed

07cr2871

out.  *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  *See also id.* ("The 'word' should is used to express a duty [or] obligation.") (quoting *The Oxford American Diction and Language Guide* 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...."  *See* Ex. A at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution.  No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict."  *Vasquez*, 474 U.S. at 264.

Nor does the *Navarro-Vargas II* majority's faith in the structure of the grand jury a cure for the instructions excesses.  The *Navarro-Vargas II* majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."  408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent."  *Id.* at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power."  *See id.* at 1214 (Hawkins, J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the

07cr2871

1  majority believes save[] the instruction." *Id.* After all, it is an "'almost invariable assumption

2  of the law that jurors follow their instructions.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S.

3  200, 206 (1987)). If "invariable assumption" were to hold true, then the grand jurors

4  could not possibly fulfill the role described in *Vasquez*. Indeed, "there is something

5  supremely cynical about saying that it is fine to give jurors erroneous instructions because

6  nothing will happen if they disobey them." *Id.*

7       In setting forth Judge Hawkins' views, Mr. Hernandez-Bahena understands that this

8  Court may not adopt them solely because the reasoning that supports them is so much more

9  persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to*

10 *extend* what is already untenable reasoning.

11      Here, again, the question is not an obscure interpretation of the word "should", but an

12 absolute ban on the right to refuse to indict that directly conflicts with the recognition of that

13 right in *Vasquez*, *Campbell*, and both *Navarro-Vargas II* opinions. *Navarro-Vargas II* is

14 distinguishable on that basis, but not only that.

15      Judge Burns did not limit himself to denying the grand jurors the power that *Vasquez*

16 plainly states they enjoy. He also apparently excused prospective grand jurors who might

17 have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case,

18 because they could not adhere to [that] principle...." *See* Ex. A at 8. The structure of the

19 grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no

20 longer there, likely because they expressed their willingness to act as the conscience of the

21 community. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand

22 jury exercising its powers under *Vasquez* "serves ... to protect the accused from the other

23 branches of government by acting as the 'conscience of the community.'") (quoting *Gaither*

24 *v. United States*, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess

25 only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure,"

26 *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned

27 his own rules and enforced them. The instructions here are therefore structural error. *See*

28

1  *Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting).   The indictment must be

2  dismissed.

3          **iii.    The Instructions Conflict With *Williams*' Holding that there Is No Duty
             to Present Exculpatory Evidence to the Grand Jury.**

4

5          In *Williams*, the defendant, although conceding that it was not required by the Fifth

6  Amendment, argued that the federal courts should exercise their supervisory power to order

7  prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such

8  disclosure required by Fifth Amendment common law.  *See* 504 U.S. at 45, 51.  *Williams*

9  held that "as a general matter at least, no such 'supervisory' judicial authority exists."  *See id.*

10  at 47.   Indeed, although the supervisory power may provide the authority "to dismiss an

11  indictment because of misconduct before the grand jury, at least where that misconduct

12  amounts to a violation of one of those 'few, clear rules which were carefully drafted and

13  approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'"

14  *id.* at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of

15  prosecutorial conduct in the first instance."  *Id.* at 47 (emphasis added).  The federal courts

16  possess only "very limited" power "to fashion, on their own initiative, rules of grand jury

17  procedure."  *Id.* at 50.  As a consequence, *Williams* rejected the defendant's claim, both as

18  an exercise of supervisory power and as Fifth Amendment common law.  *See id.* at 51-55.

19          Despite the holding in *Williams*, the instructions here assure the grand jurors that

20  prosecutors would present to them evidence that tended to undercut probable cause.  *See* Ex.

21  A at 20.

22          Now, again, this emphasizes the difference between the function of the grand
            jury and the trial jury.  You're all about probable cause.  If you think that

23          there's evidence out there that might cause you say "well, I don't think probable
            cause exists," then it's incumbent upon you to hear that evidence as well.  As

24          I told you, in most instances, *the U.S. Attorneys are duty-bound to present
            evidence that cuts against what they may be asking you to do if they're aware*

25          *of that evidence.*

26  *Id.* (emphasis added).   Moreover, the district court later returned to the notion of the

27  prosecutors and their duties, advising the grand jurors that they "can expect that the U.S.

28

1  Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll

2  act in good faith in all matters presented to you." *See id.* at 27.

3        This particular instruction has a devastating effect on the grand jury's protective

4  powers, particularly if it is not true.  It begins by emphasizing the message that *Navarro-*

5  *Vargas II* somehow concluded was not conveyed by the previous instruction: "You're all

6  about probable cause." *See* Ex. A at 20.  Thus, once again, the grand jury is reminded that

7  they are limited to probable cause determinations (a reminder that was probably unnecessary

8  in light of the fact that Judge Burns had already told the grand jurors that they likely would

9  be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors

10 that they should consider evidence that undercuts probable cause, but also advises the grand

11 jurors that the prosecutor will present it.  The end result, then, is that grand jurors should

12 consider evidence that goes against probable cause, but, if none is presented by the

13 government, they can  presume that there is none.  After all, "in most instances, the U.S.

14 Attorneys are duty-bound to present evidence that cuts against what they may be asking you

15 to do if they're aware of that evidence." *See id.*  Thus, if the exculpatory evidence existed,

16 it necessarily would have been presented by the "duty-bound" prosecutor, because the grand

17 jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid,

18 they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at

19 27.

20       These instructions create a presumption that, in cases where the prosecutor does not

21 present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in

22 a case in which no exculpatory evidence was presented, would proceed along these lines:

23          (1) I have to consider evidence that undercuts probable cause.
         (2)  The candid, honest, duty-bound prosecutor would, in good faith,
24          have presented any such evidence to me, if it existed.
         (3)  Because no such evidence was presented to me, I may conclude
25          that there is none.

26 Even if some exculpatory evidence were presented, a grand juror would necessarily presume

27 that the evidence presented represents the universe of all available exculpatory evidence; if

28 there was more, the duty-bound prosecutor would have presented it.

07cr2871

1    The instructions therefore discourage investigation–if exculpatory evidence were out

2    there, the prosecutor would present it, so investigation is a waste of time–and provide

3    additional support to every probable cause determination: i.e., this case may be weak, but I

4    know that there is nothing on the other side of the equation because it was not presented.  A

5    grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

**III.**

**MOTION TO DISMISS INDICTMENT FOR FAILURE TO ALLEGE**

**ELEMENTS**

**A.    Introduction**

10    The indictment must be dismissed because the government has failed to properly

11    allege all elements of the offense.  The Fifth Amendment requires that "[n]o person shall be

12    held to answer for a capital, or otherwise infamous crime, unless on a presentment or

13    indictment of a Grand Jury . . .."  Consistent with this Constitutional requirement, the

14    Supreme Court has held that an indictment must "fully, directly, and expressly, without any

15    uncertainty or ambiguity, set forth all the elements necessary to constitute the offense

16    intended to be punished."  United States v. Carll, 105 U.S. 611, 612-13 (1881) (emphasis

17    added).  It is black letter law that an indictment that does not allege an element of an offense,

18    even an implied element, is defective, and should be dismissed.  See, e.g., Russell v. United

19    States, 369 U.S. 749, 769-72 (1962); Stirone v. United States, 361 U.S. 212, 218-19 (1960);

20    United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999); United States v. Keith, 605

21    F.2d 462, 464 (9th Cir. 1979).

22    First, the indictment charges a violation of Title 8, United States Code, Sections

23    1326(a) and (b).  In United States v. Salazar-Lopez, __ F.3d __, 2007 WL 3085906 at *2 (9th

24    Cir. Oct. 24, 2007), the Ninth Circuit indicated that to be sufficient, an indictment charging

25    a violation of section 1326(b) must allege either that the defendant has been previously

26    removed subsequent to a conviction (i.e., for a misdemeanor, a felony, an aggravated felony,

27    or a crime of violence), or it must allege a specific date of the prior removal.  In this case, the

28    indictment only alleges that Mr. Hernandez-Bahena "was removed from the United States

07cr2871

1   subsequent to November 29, 1999."  The indictment does not allege either that this removal

2   occurred subsequent to a conviction or allege a specific date of the prior removal.  Therefore,

3   because the indictment does not allege all elements of section 1326(b), the indictment must

4   be dismissed.  Second, the indictment, although purportedly alleging a violation of sub-

5   section (b) of section 1326, does not allege that Mr. Hernandez-Bahena has suffered a prior

6   conviction.

7   **B.    Failure to allege date of deportation, or its temporal relationship to a removal**

8       Mr. Hernandez-Bahena has a Fifth Amendment right to have a grand jury pass upon

9   those facts necessary to convict him at trial.  In the indictment, the government included the

10  language:  "It is further alleged that defendant EDUARDO HERNANDEZ-BAHENA was

11  removed from the United States subsequent to November 29, 1999."[11]  The indictment in this

12  case violates Mr. Hernandez-Bahena's right to presentment in two ways.  First, the language

13  added by the government does not ensure that the grand jury actually found probable cause

14  that Mr. Hernandez-Bahena was deported after November 29, 1999, as opposed to simply

15  being physically removed from the United States.  Second, that the grand jury found probable

16  cause to believe that Mr. Hernandez-Bahena was removed "subsequent to November 29,

17  1999" does not address the possibility that the government may at trial rely on a deportation

18  that was never presented to, or considered by, the grand jury.

19      The Fifth Amendment provides that "[n]o person shall be held to answer for a capital,

20  or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S.

21  Const. Amend. V.  The Sixth Amendment provides that "[i]n all criminal prosecutions the

22  accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . 

23  . .."  U.S. Const. Amend. VI.  Thus, a defendant has a constitutional right to have the charges

24  against him presented to a grand jury and to be informed of the grand jury's findings via

25

26      [11]  Presumably, the government added this language in an attempt to comply with the
    Ninth Circuit's decision in United States v. Covian-Sandoval, 462 F.3d 1090 (9th Cir. 2006).  In
27  Covian-Sandoval, the Ninth Circuit held that it is an Apprendi violation for a court to increase a
    person's statutory maximum under 8 U.S.C. § 1326(b) via a court-finding that a person had been
28  removed from the United States following a conviction.  This language, however, does not cure the
    problems with this indictment.

1    indictment.  See Russell, 369 U.S. at 763 (An indictment must "contain[] the elements of the

2    offense intended to be charged, and sufficiently apprise[] the defendant of what he must be

3    prepared to meet.").

4         To be sufficient, an indictment must allege every element of the charged offense.  See

5    United States v. Morrison, 536 F.2d 286, 287 (9th Cir. 1976) (citing United States v.

6    Debrow, 346 U.S. 374 (1953)).  Indeed, in order to be sufficient, an indictment must include

7    implied elements not present in the statutory language.  See Du Bo, 186 F.3d at 1179.  "If an

8    element is necessary to convict, it is also necessary to indict, because elements of a crime do

9    not change as criminal proceedings progress."  United States v. Hill, 279 F.3d 731, 741 (9th

10   Cir. 2002).  An indictment's failure to "recite an essential element of the charged offense is

11   not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment."  Du

12   Bo, 186 F.3d at 1179.

13        In the indictment, the government here has added the language:   "It is further alleged

14   that defendant EDUARDO HERNANDEZ-BAHENA was removed from the United States

15   subsequent to November 29, 1999."  There is no indication from this "allegation" that the

16   grand jury was charged with the legal meaning of the word "removal" applicable in this

17   context, as opposed to being simply removed from the United States in a colloquial sense.

18   It is clear from Covian-Sandoval that in order to trigger the enhanced statutory maximum

19   contained in section 1326(b), the government must prove that a person was removed—as that

20   term is used in the immigration context—after having suffered a conviction. 462 F.3d at

21   1097-1098 (noting as part of its analysis that immigration proceedings have fewer procedural

22   protections that criminal proceedings).  A deportation has the following elements: "(1) that

23   a deportation proceeding occurred as to [the] defendant and as a result, [(2)] a warrant of

24   deportation was issued and [(3)] executed by the removal of the defendant from the United

25   States."  See United States v. Castillo-Basa, 483 F.3d 890 (9th Cir. 2007) (citing, without

26   contesting, the elements of a deportation provided by the district court.)  As this is the type

27   of removal the government must prove before a petite jury, it is necessary that the

28   government allege such a removal before the grand jury.  As returned, however, there is no

1   assurance from the face of the indictment that the grand jury in this case was charged with

2   the type of removal necessary to increase a person's statutory maximum under section

3   1326(b).

4        As such, there is no fair assurance that the grand jury will have passed upon those

5   facts necessary to convict Mr. Hernandez-Bahena.  Additionally, as charged, there is no fair

6   assurance that the indictment will contain those allegations the government will attempt to

7   prove at trial.  If the government alleged before the grand jury that Mr. Hernandez-Bahena

8   was removed (in a colloquial sense), but offers proof at trial that Mr. Hernandez-Bahena was

9   removed (in an immigration sense), there will be a constructive amendment of the indictment

10  at trial.  See Stirone v. United States, 361 U.S. 212, 217-19 (1960).  Either scenario

11  represents a violation of Mr. Hernandez-Bahena's right to presentment.  Stirone, 361 U.S. at

12  218-19.

13       A second problem with the indictment is that there is no indication which (if any)

14  deportation the government presented to the grand jury.  In most cases, the government will

15  have a choice of deportations to present to the grand jury to support an allegation that a

16  person had been deported after a specific date.  According to information provided by the

17  government, although not conceded by the defendant, Mr. Hernandez-Bahena has been

18  deported on several occasions.  This renders it a very real possibility that the government

19  alleged one deportation to the grand jury to sustain its allegation that Mr. Hernandez-Bahena

20  was removed from the United States, but will attempt to prove at trial a wholly different

21  deportation to sustain its trial proof.  If this were to turn out to be the case, Mr. Hernandez-

22  Bahena's right to have the grand jury pass on all facts necessary to convict him would be

23  violated.  See Du Bo, 186 F.3d 1179.

24  **C.    Failure to allege a prior conviction**

25       Although purportedly alleging a violation of sub-section (b) of section 1326, the

26  indictment here does not allege that Mr. Hernandez-Bahena has suffered a prior conviction.

27  Mr. Hernandez-Bahena moves to dismiss the indictment on this basis.  Mr. Hernandez-

28  Bahena recognizes that Ninth Circuit law is contrary to his position.  See Covian-Sandoval,

1    462 F.3d at 1096-98.    He nonetheless raises the issue to preserve his requested

2    remedy—dismissal based on structural error.  See United States v. Salazar-Lopez, No. 06-

3    50438, __ F.3d __ (9th Cir. Oct. 24, 2007), available as 2007 U.S. App. Lexis 24788 *1, *8-

4    *14.

5                                              **IV.**

6                        **MOTION TO STRIKE SURPLUSAGE**

7           The above arguments to dismiss the indictment based on the government's failure to

8    comply with Mr. Hernandez-Bahena's Fifth and Sixth Amendment rights is premised on

9    Covian-Sandoval having read into section 1326 an additional element—a deportation that

10   occurred at a particular time—that the government must plead to the grand jury and prove

11   to a jury.   To the extent the government argues that Covian-Sandoval did not create an

12   additional element, the indictment contains surplusage.  In other words, if the government

13   argues that the timing of a person's deportation is not a element of section 1326, but rather

14   a sentencing factor under subsection (b) of section 1326, the indictment alleges a fact—the

15   timing of a person's deportation—the Supreme Court has clearly held to be decided by a

16   judge.

17          The Ninth Circuit has "repeatedly held that language [in an indictment] that describes

18   elements beyond what is required under statute is surplusage and need not be proved at trial."

19   Bargas v. Burns, 179 F.3d 1207, 1216 n. 6 (9th Cir. 1999).  Surplusage in an indictment is

20   subject to being struck at the request of the defendant.  United States v. Fernandez, 388 F.3d

21   1199, 1220-21 (9th Cir. 2004).  In this case, if the government argues that the date of a

22   person's deportation is not a required element of section 1326, the indictment contains

23   language beyond that which is necessary to convict Mr. Hernandez-Bahena of violating

24   section 1326.  If the date of a person's deportation is not an element of section 1326, then the

25   language in the indictment—"  "It is further alleged that defendant MARCO ANTONIO

26   Hernandez-Bahena, was removed from the United States subsequent to November 21,

27   2005."—is surplusage.  So too is the government's allegation in the indictment that Mr.

28   Hernandez-Bahena violated section 1326, subsection (b).

07cr2871

1    At one time, the Ninth Circuit considered subsection (b) of section 1326 a separate

2    offense from subsection (a). <u>See</u> <u>United States v. Corona-Sanchez</u>, 291 F.3d 1201, 1203 (9th

3    Cir. 2002) (<i>en banc</i>). This changed, however, following the Supreme Court's decision in

4    <u>Almendarez-Torres v. United States</u>, 523 U.S. 224 (1998). <u>See</u> <u>Corona-Sanchez</u>, 291 F.3d

5    at 1203. In <u>Almendarez-Torres</u>, the Supreme Court decided that subsection (b) of section

6    1326 described a sentencing provision, to be determined by a judge, rather than a substantive

7    offense. <u>See</u> <u>id.</u> Following <u>Almendarez-Torres</u>, the Ninth Circuit rethought the way in

8    which subsection (b) should be viewed, to the extent that indictments and judgements that

9    reflect a violation of both subsection (a) and subsection (b) of section 1326 should have the

10    reference to subsection (b) struck to "unambiguously reflect that the defendant was convicted

11    of only one punishable offense pursuant . . .." <u>Id.</u>

12    Although an allegation of a particular date of deportation would likely be an

13    appropriate response on the government's part to the holding of <u>Covian-Sandoval</u>, the

14    government here has chosen to include in the indictment an allegation that goes solely

15    towards an allegation under subsection (b) of section 1326. Indeed, the government has

16    chosen to actually allege a violation of subsection (b) of section 1326 in the indictment. As

17    <u>Almendarez-Torres</u> makes clear, however, Congress clearly intended findings under

18    subsection (b) of section 1326 to made by a judge, rather than a jury. <u>Almendarez-Torres</u>,

19    523 U.S. at 235 ("we believe that Congress intended to set forth a sentencing factor in

20    subsection (b)(2) and not a separate criminal offense).

21    Although the Ninth Circuit is free to overrule its own precedent regarding whether

22    Congress intended a statutory provision to be decided by a judge, rather than a jury, <u>see, e.g.,</u>

23    <u>United States v. Buckland</u>, 289 F.3d 558, 564-68 (9th Cir. 2002) (<i>en banc</i>) (discussing

24    enhanced penalties under 21 U.S.C. § 841), it has not seen fit to overrule the Supreme

25    Court's decision in <u>Almendarez-Torres</u>. <u>See, e.g.</u>, <u>United States v. Weiland</u>, 420 F.3d 1062,

26    1079 n. 16 (9th Cir. 2005). For these reasons, to the degree the government argues that

27    <u>Covian-Sandoval</u> did not create an additional element of section 1326, the government has

28    pled in the

1  indictment an allegation that Congress intended to be decided by judge, rather than a jury.[12]

2  Therefore, pursuant to Federal Rule of Criminal Procedure 7(d), Mr. Hernandez-Bahena

3  moves to strike this surplusage from the indictment.

4  **V.**

5  **MOTION TO PRODUCE GRAND JURY TRANSCRIPTS**

6  Mr. Hernandez-Bahena moves this Court to compel the government to produce all

7  grand jury transcripts in this case. See U.S. CONST. AMENDS V & VI[13]. Federal Rule of

8  Criminal Procedure 6(e)(3)(E)(ii) allows disclosure "at the request of a defendant who shows

9  that a ground may exist to dismiss the indictment because of a matter that occurred before

10  the grand jury."  Given the arguments raised above, it is clear that "a ground may exist to

11  dismiss the indictment because of a matter that occurred before the grand jury." Fed. R.

12  Crim. P 6(e)(3)(E)(ii). Mr. Hernandez-Bahena requests the Court "authorize disclosure" of

13

14

15  [12] The holdings in Covian-Sandoval and Almendarez-Torres also render subsection (b) of section 1326 unconstitutional. In Covian-Sandoval, the Ninth Circuit held that a jury must determine

16  the timing of a person's deportation to trigger subsection (b)'s enhanced statutory maximum. Covian-Sandoval, 462 F.3d 1097-1098. In Almendarez-Torres, however, the Supreme Court held

17  that Congress intended subsection (b) to be a sentencing provision to be determined by a judge. Almendarez-Torres, 523 U.S. at 235. It is thus clear that subsection (b), as written and construed

18  by the Supreme Court, violates Apprendi.

19  [13] The Supreme Court has found that "[t]he grand jury is an integral part of our constitutional

20  heritage which was brought to this country with the common law.  The Framers, most of them trained in the English law and traditions, accepted the grand jury as a basic guarantee of individual

21  liberty . . . the grand jury continues to function as a barrier to reckless or unfounded charges. 'Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases

22  shows the high place it held as an instrument of justice.' Costello v. United States, 350 U.S. 359,

23  362 (1956). Its historic office has been to provide a shield against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a

24  representative body of citizens acting under oath and under judicial instruction and guidance. "

25  United States v. Manduano, 425 U.S. 564, 571 (1976).  In order to ensure that the criminally accused are safeguarded from reckless and unfounded charges, judges must take their duty to provide

26  guidance seriously and not simply pay lip service to the assurances of the government.  It is curious why the government, in this district in particular, fights so hard to keep grand jury proceedings

27  sealed.  Interestingly, in many cases, the "witness" who "testifies" before the grand jury is a border patrol agent who neither participated in the arrest or the investigation.  He is only called to read a

28  report which has been prepared by others.  Such a practice does not allow for the considered judgment of grand jurors.  Thus, the release of transcripts is appropriate.

07cr2871

1  the grand jury transcript to allow Mr. Hernandez-Bahena to adequately prepare for trial and

2  to perfect his appellate record.  See id.

3                                      **VI.**

4                    **MOTION GIVING NOTICE UNDER RULE 12.2**

5      Mr. Hernandez-Bahena gives notice of his intention to introduce evidence of a mental

6  disease, defect or condition bearing on the issue of guilt.  See Federal Rule of Criminal

7  Procedure 12.2(b).

8                                      **VII.**

9                    **MOTION FOR LEAVE TO FILE FURTHER MOTIONS**

10      Mr. Hernandez-Bahena has received 138 pages of discovery.  He requests leave to file

11  further motions if necessary.

12                                     **VIII.**

13                                 **CONCLUSION**

14      Mr. Hernandez-Bahena requests this Court grant his motions.

15                                              Respectfully submitted,

16                                               /s/ Robert H. Rexrode
    Dated: December 24, 2007                    **ROBERT H. REXRODE, III**
17                                              Attorney for Mr. Hernandez-Bahena
                                                robert_rexrode@rexrodelawoffices.com

18

19

20

21

22

23

24

25

26

27

28